Robert J. Nelson (to be admitted *pro hac vice*)
rnelson@lchb.com
Fabrice N. Vincent (to be admitted *pro hac vice*)
fvincent@lchb.com
Jacob H. Polin (to be admitted *pro hac vice*)
jpolin@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Alexandra L. Foote (to be admitted *pro hac vice*)
LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  786.408.8083
Facsimile:  415.956.0561

Steven C. Berman, OSB No. 951769
sberman@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:  503.227.1600
Facsimile:  503.227.6840

*Attorneys for Plaintiffs Sero, Inc. dba Beast*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SERO, INC. dba Beast, an Oregon Corporation, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>BERKLEY NORTH PACIFIC GROUP, LLC, a Delaware Corporation, BERKLEY INSURANCE COMPANY, a Delaware Corporation, W. R. BERKLEY CORPORATION, a Delaware Corporation, CONTINENTAL WESTERN INSURANCE COMPANY, an Iowa Corporation,<br><br>        Defendants. | Case No.   3:20-cv-00776<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>**1. BREACH OF CONTRACT,**<br>**2. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING,**<br>**3. UNFAIR TRADE PRACTICES,**<br>**4. DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION ALLEGATION COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 1

II.     PARTIES ............................................................................ 2

        A.      Plaintiff ................................................................. 2

        B.      Defendants ............................................................ 2

III.    JURISDICTION AND VENUE ........................................... 4

IV.     FACTUAL BACKGROUND ............................................... 5

        A.      The Rapid Spread of Coronavirus............................ 5

        B.      Governments Around the Country Order Everyone to Shelter in
                Place..................................................................... 7

        C.      Beast Closes ......................................................... 9

        D.      The Losses From Beast's Closure Are A Covered Business
                Interruption ......................................................... 10

        E.      Defendants' Denial of Beast's Insurance Claim ...... 14

V.      CLASS ACTION ALLEGATIONS ................................... 16

VI.     CAUSES OF ACTION ..................................................... 19

        FIRST CAUSE OF ACTION Breach of Contract ............... 19

        SECOND CAUSE OF ACTION Breach of Covenant of Good Faith and
        Fair Dealing ................................................................. 20

        THIRD CAUSE OF ACTION Unlawful Trade Under Rev. Code of Wash.
        § 19.86.010, *et seq.* ..................................................... 22

        FOURTH CAUSE OF ACTION Declaratory Relief............ 24

VII.    PRAYER FOR RELIEF ................................................... 26

VIII.   JURY TRIAL DEMAND ................................................. 27

Plaintiff Sero, Inc., an Oregon corporation, dba Beast ("Beast"), on behalf of itself and all others similarly situated, files this Complaint Against Defendants Berkley North Pacific Group, LLC, a Delaware Corporation, Berkley Insurance Company, a Delaware Corporation, W. R. Berkley Corporation, a Delaware Corporation, and Continental Western Insurance Company, an Iowa Corporation, (collectively, "Defendants"), , and alleges as follows:

I.    **INTRODUCTION**

1.      Beast is a celebrated Portland restaurant that serves a rotating tasting menu. Every night each guest enjoys the same selection of dishes while dining together with other guests at two large communal tables that seat a total of two dozen patrons.[1]  Beast was created by Naomi Pomeroy, a recipient of the prestigious James Beard Award for Best Chef in the Northwest in 2014.  Ms. Pomeroy is an Oregon native who is also a Food & Wine "Top 10 Best New Chef in America" alum and a "Star Chefs" Rising Star.

2.      About two months ago, in mid-March, 2020, Beast was forced to shut down.  This closure was ordered by the state of Oregon, which required that Ms. Pomeroy, her staff, and Beast's customers "shelter in place" and abide by strict "social distancing" guidelines.  As with almost all restaurants, Beast did not have significant cash reserves and quickly depleted what funds it had during the period of reduced business that preceded the shutdown.  The closure—and accompanying loss of income—forced Ms. Pomeroy to furlough and lay off employees. Notwithstanding this, Beast continued to fund medical benefits for its employees.  However, with mounting expenses and zero income, Beasts' ability to continue making these payments may be limited.  Absent a reversal of the order or financial support, Beast may have to consider even more drastic measures.

3.      To protect its business (and employees) from having to make such terrible choices in situations like this one, Beast purchased insurance from Defendants that provided coverage for business interruption.  Indeed, when it began furloughing employees, Beast anticipated

---

[1] Sometimes Beast adds seating for two additional guests.

conducting re-hirings once Defendants began providing insurance coverage for Beast's business shutdown.  Beast's insurance policy expressly provides coverage for "Lost Business Income" and the consequences of actions by "Civil Authority."  Accordingly, Beast understandably believed that its policy would help protect its business in the unlikely event that the government ever ordered it to stop or severely restrict operations (in connection with a pandemic or any other Covered Cause of Loss).

4.     Contrary to the coverage provisions in its policy with Beast, and the obligations Defendants undertook in exchange for Beast's insurance premium payments, Defendants summarily denied Beast's claim for business interruption coverage.  This denial was part of a premeditated strategy by Defendants to deny all claims related to the "shelter in place" orders associated with COVID-19.  Defendants' decision to deny coverage was untethered to the facts of Beast's claim, which Defendants did not adequately investigate, or the specific coverage provided by Beast's policy, and was therefore illegal.

5.     The other members of the proposed Class (defined below) were subject to the same conduct by Defendants.  As a result of Defendants' wrongful conduct as alleged herein, Beast and other Class members suffered damages and, absent appropriate injunctive and declaratory relief, will continue to be harmed by Defendants' misconduct.

## II.     PARTIES

### A.     Plaintiff

6.     Plaintiff Sero Inc. ("Beast") is an Oregon corporation that does business as and owns Beast, a restaurant located in Portland, Oregon.

7.     Sero Inc. was formed in 2013 by "conversion" from Sero, LLC.

8.     Insurance documents referencing Sero, LLC apply to Sero Inc. (and vice versa).

### B.     Defendants

9.     Defendant Berkley North Pacific Group, LLC is a Delaware corporation whose "home office" is located in Bellevue, Washington.

10.    Berkley North Pacific Group, LLC has been registered to do business in Oregon.

11.    Berkley North Pacific Group, LLC was registered to do business in Oregon when Beast's policy was issued.

12.    Berkley North Pacific Group, LLC has an office in Lake Oswego, Oregon.

13.    Berkley North Pacific Group, LLC has or had a registered agent in Salem, Oregon.

14.    Defendant Berkley Insurance Company is a Delaware Corporation, with a principal place of business in Greenwich, Connecticut.

15.    Berkley Insurance Company is registered to do business in Oregon.

16.    Berkley Insurance Company operates in Lake Oswego, Oregon.

17.    Defendant W. R. Berkley Corporation is a Delaware corporation with a principal place of business in Greenwich, Connecticut.

18.    Berkley North Pacific Group, LLC is identified as "a Berkley Company."

19.    Berkley North Pacific Group, LLC is identified as "a Berkley Company" because it is owned by and does business on behalf of Berkley Insurance Company.

20.    Berkley North Pacific Group, LLC is identified as "a Berkley Company" because it is owned by and does business on behalf of W. R. Berkley Corporation.

21.    The insurance policy that Defendants issued to Beast contains branding indicating that it comes from "a Berkley Company."

22.    W. R. Berkley Corporation and Berkley Insurance Company provide "insurance solutions through more than 50 Berkley companies,"[2] and describe Berkley North Pacific Group, LLC as an "operating unit."[3]

23.    Defendant Continental Western Insurance Company is an Iowa corporation with a principal place of business in Des Moines, Iowa.

---

[2] www.berkley.com/; https://www.berkleynpac.com/terms-and-conditions/.
[3] www.berkley.com/our-business/operating-units.

24.     The insurance policy that Defendants issued to Beast contains language indicating that Continental Western Insurance Company is the "issuing company."  Defendants' denial letter to Beast identifies Continental Western Insurance Company as the "carrier" and is signed by a representative who identifies herself as associated with Berkley North Pacific and Continental Western Insurance Company.

25.     At all relevant times, each Defendant conducted business through the name of each other Defendant.

26.     At all relevant times, each Defendant directed, authorized, controlled, and/or participated in the conduct of every other Defendant (to the extent any independent conduct can be ascribed to these corporations).  Similarly, acts taken by each Defendant were within the course, scope, and authority of each and every other Defendants' directions, authorizations, and controls.  All actions of each Defendant alleged in each cause of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other Defendant.

27.     In committing the wrongful acts alleged herein, each of the Defendants pursued, or joined in the pursuit of, a common course of conduct, and has acted in concert and/or conspired with one another in furtherance of the improper acts and transactions that are the subject of this Complaint.

## III.    **JURISDICTION AND VENUE**

28.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class is a citizen of a state different from that or those of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Class consist of more than 100 class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

29.     This Court has personal jurisdiction over Defendants because Defendants did business in Oregon, have sufficient minimum contacts in Oregon, and otherwise intentionally

availed themselves of the markets within Oregon through their business activities, such that the exercise of jurisdiction by this Court is proper. Moreover, the claims of Plaintiff and numerous Class members in this case arise out of and directly relate to Defendants' contacts with Oregon, including Defendants' marketing and sale of insurance policies to, and denial of insurance coverage for losses incurred by, Plaintiff and other Class members in the State of Oregon.

30.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendants have marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business, within this District, and Defendants denied insurance coverage for losses incurred by Plaintiff and other Class members in this District.

31.     Divisional Venue: This action is properly assigned to the Portland Division because Plaintiff Beast is located there.

## IV.   FACTUAL BACKGROUND

### A.   The Rapid Spread of Coronavirus

32.     COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19"). The first instances of the disease spreading to humans were diagnosed in or around December 2019.

33.     According to the World Health Organization ("WHO"): "People can catch COVID19 from others who have the virus. The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales. These droplets land on objects and surfaces around the person. Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth. People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets."[4]

---

[4] *See* Q&A on coronaviruses (COVID-19), "How does COVID-19 spread?," World Health Organization (April 16, 2020), *available at* https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited April 21, 2020).

34.    This is problematic, *inter alia*, because a human sneeze can expel droplets of mucus and saliva that travel at nearly a hundred miles an hour and can spread up to 27 feet.[5]

35.    According to a recent report in the New York Times, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[6]    The more people in a conversation, the more droplets are dispersed.

36.    Although these droplets are smaller and less visible than rust, mold, or paint, they are physical objects which can travel to other objects and cause harm.

37.    These droplets can spread Coronavirus when they reach humans directly, or when they land on habitable surfaces where they can survive until that surface is touched by a potential human host.[7]

38.    Droplets containing Coronavirus infect a variety of surfaces and objects for a period of a hours, days, or weeks, if not longer.  After inspecting a cruise ship inhabited by passengers carrying the Coronavirus, the CDC reported that Coronavirus was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[8]

39.    Recent scientific evidence shows that Coronavirus can survive and remain virulent on stainless steel and plastic for three to six days; on glass and banknotes for three days; and on wood and cloth for 24 hours.[9]

---

[5] Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), *available at* www.nationalgeographic.com/science/2020/04/ coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited April 20, 2020).

[6] *See* Yuliya Pashina-Kottas, et al., "This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 21, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited April 21, 2020).

[7] *See*, *e.g.*, CDC website, "How COVID-19 Spreads*,*" 2020, *available at* https://www.cdc.gov /coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 21 2020).

[8] *See* Leah E. Moriary, et al., "Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (March 23, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited April 21, 2020).

[9] *See* Neeltje van Doremalen, et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared to SARS-CoV-1," New England Journal of Medicine (Mar. 17, 2020), *available at*

40.    Testing involving similar viruses in the Coronavirus family shows that Coronavirus can likely survive on ceramics, silicon rubber, or paper for up to five days if not longer.[10]

41.    When public areas containing such surfaces may have been exposed to Coronavirus, a number of countries including China, Italy, France, and Spain have required such areas to be fumigated prior to re-opening.[11]

42.    This Coronavirus has spread throughout Oregon and the United States.

**B.    Governments Around the Country Order Everyone to Shelter in Place**

43.    As the Coronavirus spread in Oregon, state and local officials began discussing wide scale business closures.

44.    On March 13, 2020 President Trump declared the COVID-19 outbreak a national emergency.

45.    On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled

---

https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973 (last visited April 21, 2020); Alex W.H. Chin, et al., "Stability of SARS-CoV-2 in different environmental conditions," The Lancet Microbe (April 2, 2020), available at https://doi.org/10.1016/S2666-5247(20)30003-3 (last visited April 21, 2020).

[10] *See* Guenter Kampf, et al., "Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents," 104 Journal of Hospital Infection 246 (Feb. 6, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7132493/pdf/main.pdf (last visited Apr. 21, 2020).

[11] *See* Mike Bird, et al., "China Is Open for Business, but the Postcoronavirus Reboot Looks Slow and Rocky," *The Wall Street Journal* (March 26, 2020), *available at* www.wsj.com/articles/china-is-open-for-business-but-the-post-coronavirus-reboot-looks-slow-and-rocky-11585232600 (last visited April 22, 2020); Jason Horowitz, "In Italy, Going Back to Work May Depend on Having the Right Antibodies," *The New York Times* (April 4, 2020), *available at* www.nytimes.com/2020/04/04/world/europe/italy-coronavirus-antibodies.html (last visited April 22, 2020); Sarah Elzas, "French Teachers Push Back against Reopening Schools in May," *RFI* (released online Apr. 14, 2020), *available at* www.rfi.fr/en/france/20200414-french-teachers-push-back-against-reopening-schools-in-may (last visited April 22, 2020); Claudia Nuñez, "On the Front Line of the Coronavirus Threat in Spain, Tractors Scatter the Streets with Hope," *Los Angeles Times* (March 27, 2020), *available at* www.latimes.com/world-nation/story/2020-03-27/on-the-front-line-of-the-pandemic-tractors-scatter-the-streets-with-hope (last visited April 22, 2020).

as "30 Days to Slow the Spread" concerning measures to slow the spread of COVID-19. This guidance advocated for far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.

46.    On March 17, 2020 Governor Brown issued Executive Order 20-07 prohibiting restaurants throughout Oregon from "offer[ing] or allow[ing] on-premises consumption of food or drink." Ex. 1 ¶ 1. The Order also required that restaurants implement social distancing protocols for staff. *Id.* at ¶ 2. This order went into effect on March 17, 2020 and was to remain in effect through April 14, 2020. *Id.* at ¶ 8.

47.    On March 28, 2020 the United States Department of Homeland Security issued a memorandum concerning the "Identification of Essential Critical Infrastructure Workers During Covid-19 Response."[12] This memorandum provided guidance for the implementation and standardization of all state shelter in place orders and the restrictions they place on different essential and non-essential businesses.

48.    On April 7, 2020 Governor Brown issued Executive Order 20-14 which extended Executive Order 20-07 indefinitely. Ex. 2. Collectively, this order and the above-referenced March 17, 2020 order are referred to herein as the "Orders." The Orders remain in effect as of the date of this filing.

49.    Statewide efforts similar to Oregon's have been implemented around the country in response to thousands if not tens or hundreds of thousands of confirmed inflections. State governments have required large scale business closures and imposed other limitations on customer and employee movement that prevent restaurants from operating and/or force them to suffer losses.

---

[12] https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_
Essential_Critical_Infrastructure_Workers_1.pdf

50.     For example, on March 16, 2020, New York Governor Andrew Cuomo, in conjunction with New Jersey Governor Phil Murphy and Connecticut Governor Ned Lamont ordered the closure of all gyms, movie theaters, bars and casinos. Ex. 3–5.[13]  Restaurants were also ordered to close except for the fulfillment of take-out and delivery orders. *Id.*

51.     In all, 49 state governments have enacted at least one civil authority order prohibiting or severely limiting dine in service and other operations at restaurants.[14]  South Dakota is the only state whose government may not yet have enacted such an order at the state level.

52.     As reflected, for example, by an April 10, 2020 proclamation by the City and County of San Francisco, these prohibiting civil authority orders have been issued "because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time." Ex. 6.

**C.     Beast Closes**

53.     On March 15, 2020 Beast closed in anticipation of the Orders.  Following the issuance of the Orders, it has not re-opened.

54.     Under the Orders, Beast was forced to close its dining room to the public, thereby prohibiting access to, use of, and operations at Beast.

55.     Under the Orders, Beast was forced to suspend dine-in food offerings at Beast and service of dine-in food to customers, thereby prohibiting access to, use of, and operations at Beast.

---

[13] These orders were subsequently extended until May 15, 2020 by Governors Cuomo (NY), Murphy (NJ), and Lamont (CT). *See* Caitlin Oprysko, Politico (April 16, 2020), "More than a dozen states have extended stay-home orders past White House deadline," https://www.politico.com/news/2020/04/16/coronavirus-stay-home-orders-extended-190889 (last accessed May 5, 2020).

[14] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last accessed May 3, 2020)

56.    Under the Orders, customers were prohibited from accessing and using Beast's dining rooms, thereby prohibiting access to, use of, and operations at Beast.

57.    Under the Orders, customers were prohibited by social distancing guidelines from accessing and utilizing Beast's dining room, thereby prohibiting access to, use of, and operations at Beast.

58.    Under the Orders, Beast's employees were prohibited from traveling to or accessing Beast for purposes of preparing and serving dine-in food, thereby prohibiting access to, use of, and operations at Beast.

59.    Under the Orders, Beast's employees were prohibited from traveling to or accessing portions of Beast utilized exclusively for preparing and serving dine-in food, thereby prohibiting access to, use of, and operations at Beast.

60.    Under the Orders, Beast's employees were prohibited from working in close proximity to each other, thereby prohibiting access to, use of, and operations at Beast.  This includes, but is not limited to, social distancing requirements and other safety requirements that are not compatible with professional use of a kitchen.

61.    Under the Orders, Beast lost access to Beast, lost use of Beast, lost necessary use of necessary facilities at Beast, and suspended operations at Beast.

62.    Beast suffered and continues to suffer substantial lost business income and other financial losses.

63.    These extraordinary losses of business income (and concern for its employees' welfare) are precisely why Beast took out insurance with Defendants that included business interruption coverage, which was meant to cover these losses.

### D.    The Losses From Beast's Closure Are A Covered Business Interruption

64.    Beast purchased an insurance policy from Defendants that included business interruption (and other related) insurance coverage.

65.     Beast promptly and dutifully paid its premiums and complied with all other elements of its agreement with Defendants.  Beast's policy number is CPA-6024894 (the "Policy").

66.     In many countries, property insurance is sold on a specific peril basis.  Such policies only cover losses from causes that are expressly covered like an earthquake, fire, or terrorist attack.  Most property policies sold in the United States are all-risk property damage policies which cover losses from all causes that are not expressly excluded.

67.     The Policy is an all-risk property damage policy because its terms indicate that it covers all risks which can cause harm to physical property except for risks that are expressly and specifically excluded.  In the "Causes of Loss" form provided to Beast, Defendants defined "Covered Causes of Loss" as covering "direct physical loss unless the loss is excluded or limited in this policy. Ex. 7 at 134.

68.     The Policy provides coverage for Lost Business Income, promising that Defendants "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'.  The 'suspension' must be caused by direct physical loss of or damage to property at [the insured] premises." *Id.* at 122.

69.     The Policy defines a "slowdown or cessation of your business activities" as a suspension for purposes of assessing this coverage.  *Id.* at 130.

70.     The Orders prohibited the physical access to, use of, and operations at and by Beast, its employees, and its customers.  As a result of the Orders, physical components of Beast became unusable, damaged, and/or lost the ability to generate income.

71.     As a result of this physical loss and/or damage, Beast suspended operations, lost business income, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

72.     The Policy also provides Civil Authority coverage, pursuant to which Defendants agreed that they "will pay for the actual loss of Business Income you sustain and necessary Extra

Expense caused by action of civil authority that prohibits access to the described premises." *Id.* at 123.

73.     Beast is located in Portland.  As the Coronavirus spread, the street on which Beast is located, and the buildings and objects in and around it, became a breeding ground for the disease.

74.     The Orders were issued as a result of physical loss, physical damage, and dangerous physical conditions occurring in properties within one mile of Beast and all around cities and business districts.  For example, prior to the issuance of the Orders, government authorities had been limiting access to other properties on the basis of the Coronavirus, including (but not limited to) sporting arenas, concert venues, and other places where large numbers of people may gather.

75.     The prohibitions and limitations imposed by the Orders prohibited access to, use of, and operations at and by Beast, its employees, and its customers.  As a result of the Orders, components of Beast became unusable and/or lost the ability to generate income.

76.     As a result, Beast lost business income, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

77.     COVID-19 is a Covered Cause of Loss under the Policy.

78.     The Business Income (and Extra Expense) Coverage Form which defines the Policy's Lost Business Income and Civil Authority coverage (CP 00 30 10 12) is a standardized form drafted by the Insurance Services Office ("ISO").  On information and belief, the form used for the Policy is also used by Defendants for numerous other insurance policies issued by Defendants to the Class members.

79.     The ISO is a company that drafts standard policy language for use in insurance contracts used by insurers around the country.

80.     In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses

resulting from the presence of disease-causing agents.  Endorsement CP 01 40 07 06, which

other insurers have since incorporated in policies, provides that the insurer "will not pay for loss

or damage caused by or resulting from any virus, bacterium or other microorganism that induces

or is capable of inducing physical distress, illness or disease."

81.     When preparing CP 01 40 07 06, ISO, circulated a statement to state insurance

regulators that included the following acknowledgement:

> Disease-causing agents may render a product impure (change its
> quality or substance), or enable the spread of disease by their
> presence on interior building surfaces or the surfaces of personal
> property. When disease-causing viral or bacterial contamination
> occurs, potential claims involve the cost of replacement of property
> (for example, the milk), cost of decontamination (for example,
> interior building surfaces), and business interruption (time
> element) losses. Although building and personal property could
> arguably become contaminated (often temporarily) by such viruses
> and bacteria, the nature of the property itself would have a bearing
> on whether there is actual property damage. An allegation of
> property damage may be a point of disagreement in a particular
> case.

82.     The insurance industry has thus recognized that the presence of virus or disease

can constitute physical damage to property since at least 2006.

83.     Defendants intentionally chose not to include CP 01 40 07 06 in the Policy and in

its insurance policies issued to other Class members.

84.     Defendants' awareness of CP 01 40 07 06 is underscored here by its inclusion in

the Policy of CP 05 06 10 18 which contains language purporting to limit application of any

included virus exclusion (if there were one) to the food contamination coverage. *See* Ex. 7 at 101

("any exclusion of virus or bacteria in this policy does not apply.")

85.     The Policy (Ex. 7 at 185) contains exclusions for any loss "caused directly or

indirectly" by acts of biological terrorism, including any "dispersal . . .  of pathogenic . . .

material."  These exclusions are not applicable to the losses suffered by Beast or the Class

members described herein.

86.     Defendants chose not to include similar language, in the Policy or in its insurance policies issued to other Class members, that would cover catastrophic disease outbreaks that are unrelated to terrorism, like pandemics.

87.     On March 23, 2020 Defendant sent Beast a letter in connection with the renewal of its policy.  This letter indicated that CL PN 51 02 06 20 was being added to the policy upon renewal.  CL PN 51 02 06 20 is entitled "Exclusion of loss due to virus or bacteria" and contains language indicating that form CP 01 40 will be attached to the policy upon renewal.

88.     Defendants are aware of contractual force majeure clauses that suspend duties to perform in the event of a global pandemic.

89.     Defendants chose not to use force majeure clauses in the Policy or in its insurance policies issued to other Class members.

###     E.     **<u>Defendants' Denial of Beast's Insurance Claim</u>**

90.     On or around March 17, 2020, Beast requested insurance coverage from Defendants. This claim was later assigned the identifying number 09 PC 99861.

91.     At an unknown time between March 17, 2020 and March 24, 2020, Defendants formally decided that Plaintiff's claim was denied.

92.     Defendants did not notify Beast promptly once they had decided that the claim was denied.

93.     Defendants decided to deny and denied Beast's claims without any inspection or review of Beast's physical location or documents concerning its business activities in 2020.

94.     Defendants have thereby waived any right to inspect such premises, deny coverage for any reason related to conditions at such location, or raise any defense related to conditions at such location or facts specific to Beast.

95.     At an unknown time between March 17, 2020 and March 24, 2020, Defendants began preparing a letter to Beast explaining that Beast's claim had been denied.

96.     On or prior to March 24, 2020, Defendants finalized this letter and saved it in their file of records.  When that denial letter was sent to Beast, it was dated March 24, 2020.

97.     The rapidity of Defendants' denial of Beast's claim, and their lack of consideration given to the specific details of the claim, indicate that Defendants could not have engaged in a good faith or reasonable investigation of the claim which included assessment of facts or issues relevant to Beast.

98.     Defendants accepted the premiums paid by Beast with no intention of providing lost business income, physical damage, civil authority, or other applicable coverage for claims like those submitted by Beast and the proposed Class members and which were denied by Defendants.

99.     Defendants' rejection of Beast's claim was part of a policy by Defendants to limit their losses during the Coronavirus pandemic, notwithstanding that the Policy provides coverage for losses due to loss of use of property and from closure orders issued by civil authorities (among other coverage).

100.     Although industry trade groups have argued that insurance companies do not have the funds to pay claims related to the Coronavirus and will require government assistance, the reality is that insurers are simply trying to minimize their exposure.  "According to data from ratings firm A.M. Best Co., the insurance industry as a whole has $18.4 billion in net reserves for future payouts."[15]

101.     Upon information and belief, Defendants collected approximately $7 billion in insurance premiums in 2019 alone.[16]  Notwithstanding this, Defendants appear to be categorically denying claims brought by businesses ordered to close following the Coronavirus,

---

[15] Leslie Scism, "U.S. Businesses Gear Up for Legal Disputes With Insurers Over Coronavirus Claims," *Wall Street Journal* (March 6, 2020), *available at* https://www.wsj.com/articles/u-s-businesses-gear-up-for-legal-disputes-with-insurers-over-coronavirus-claims-11583465668?mod=article_inline (last accessed May 4, 2020).

[16] https://www.businesswire.com/news/home/20200128005796/en/W.-R.-Berkley-Corporation-Reports-Fourth-Quarter

including those brought by Plaintiff and the proposed Class. This deliberate strategy and common policy, and the insurance industry's public requests for government assistance, suggest strongly that their true goal is minimizing payments by any means necessary.

102.    Defendants' wrongful denial of Beast's claim was not an isolated incident. Rather, on information and belief, Defendants have engaged in the same misconduct, alleged herein with respect to Beast, in connection with claims submitted by numerous of Defendants' insureds who have suffered losses related to the Coronavirus pandemic and submitted claims which were categorically denied.

103.    Beast's claims and those of the proposed Class all arise from a single course of conduct by Defendants: their systematic and blanket refusal to provide any coverage for business losses related to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations.

104.    Defendants' wrongful conduct alleged herein has caused significant damage, and if left unchecked will continue to cause significant damage, to Beast and the other members of the proposed Class.

105.    Defendants' categorical treatment, failure to investigate in good faith, and denial of Beast's and the Class members' claims appears to be part of a broader strategy being employed by the insurance industry generally, to broadly deny claims for business interruption coverage related to the Coronavirus pandemic, as has been widely reported by the media and resulted in numerous lawsuits brought by businesses against property insurance companies throughout the country.

## V.    CLASS ACTION ALLEGATIONS

106.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff brings claims (as further indicated below) on behalf of itself and a "Class" and "Oregon Subclass" defined as:

**Class**
All persons or entities in the United States (including its territories and the District

of Columbia) who own an interest in a business that served food on the premises and was insured by Defendants in March 2020, made (or attempted to make) a claim with Defendants arising from lost business income (or other losses related to business interruption) at that business related to COVID-19, and did not receive coverage for that claim.

107.    Excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and the Judge's immediate family. Plaintiff reserves the right to revise the Class definitions based upon information learned through discovery or as otherwise may be appropriate.

108.    Pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiff seeks to represent any subclasses or issue classes as Plaintiff may propose and/or the Court may designate at the time of class certification.

109.    **Numerosity: Rule 23(a)(1).** The Class is too numerous and dispersed for joinder of all Class members to be practicable.  On information and belief, the Class consists of at least hundreds, if not thousands, of persons and entities.  The precise number of Class members can be ascertained from Defendants' records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

110.    **Commonality: Rules 23(a)(2).** This action involves significant common questions of law and fact, including, but not limited to:

a.  Whether the insurance policies issued by Defendants to Plaintiff and the Class are all-risk policies?

b.  Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 required a suspension at businesses serving food on the premises?

c.  Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 prohibited access at businesses serving food on the premises?

d.  Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or related actions of civil authorities taken in response to the presence or threat of COVID-19;

e.  Whether Defendants' Civil Authority coverage applies to a loss of business income caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States;

f.  Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 breach Defendants' insurance contracts?

g.  Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unfair business practice?

h.  Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are a deceptive fraudulent business practice?

i.  Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unlawful business practice?

j.  Whether Plaintiff and the Class members are entitled to a declaratory judgment as to the meaning of their policies?

111.    ***Typicality: Rule 23(a)(3).*** Plaintiff's claims are typical of the claims of the Class members whom they seek to represent. Plaintiff and all Class members purchased insurance coverage from Defendants that included coverage for business interruption and all had claims denied pursuant to Defendants' misconduct alleged herein. Plaintiff's claims are based upon the same legal theories as the claims of the other Class members.

112.     ***Adequacy: Rule 23(a)(4).*** Plaintiff will fairly and adequately represent and protect the interests of the Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, including insurance coverage and other consumer protection litigation. Plaintiff intends to prosecute this action vigorously. Neither Plaintiff nor its counsel have interests that conflict with the interests of the other Class members.

113.     ***Rule 23(b)(2).*** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

114.     ***Rule 23(b)(3).*** Common questions of law and fact will predominate over any questions, if any, affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The damages or other financial detriment suffered by Plaintiff and the other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the class to individually seek redress for Defendants' wrongful conduct.

115.     Even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    <u>CAUSES OF ACTION</u>

**FIRST CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

116.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in paragraphs 1–115 of this Complaint.

117.     Plaintiff brings this cause of action on behalf of itself and the proposed Class.

118.    At all times relevant herein, Plaintiff and the Class have paid all premiums and fulfilled or performed all obligations they have to Defendants, including those under all relevant insurance policies described in this complaint.

119.    Defendants had contractual duties to provide Plaintiff and the Class with insurance coverage, as alleged herein.

120.    By their conduct alleged herein, including denying Plaintiff's and the Class members' insurance claims and refusing to perform under the contract, Defendants breached those duties.

121.    As a result of Defendants' breaches, Plaintiff and the Class have been damaged in the amount of coverage to which they are entitled their insurance agreements, the premiums they paid, and in an amount to be proved at trial.  Plaintiff seeks compensatory damages with interest thereon for itself and the Class members.

122.    Beast considered options for mitigating its lost income but could not find any that would be workable (or profitable).  Prior to COVID-19, Beast did not offer takeout or delivery.  Beast considered but could not shift to an alternative business model because of how its business operates, and other practical constraints.  Beast's facilities have not been used to prepare any takeout or delivery orders since the Orders.

**SECOND CAUSE OF ACTION**
**Breach of Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

123.    Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in paragraphs 1–115 of this Complaint.

124.    Plaintiff brings this cause of action on behalf of itself and the proposed Class.

125.    When Defendants entered their agreements with Plaintiff and the Class, and with any successive amendments thereto, Defendants undertook and were bound to covenants implied by law that they would deal fairly and in good faith with Plaintiff and the Class, and not engage

in any acts, conduct, or omissions that would diminish the rights and benefits due Plaintiff and the Class or defeat the reasonable expectations of Plaintiff and the Class under the their agreements with Defendants.

126.    By their conduct alleged herein, Defendants breached the implied covenant of good faith and fair dealing arising out of their agreements with Plaintiff and the Class including but not limited to by: (a) unreasonably and in bad faith denying Plaintiff and the Class members insurance coverage to which they are entitled; (b) failing and refusing to perform a fair, objective, good faith, and thorough investigation of the claim; (c) asserting coverage defenses that were legally and/or factually invalid and thereby delaying resolution of Plaintiff's and the Class members' claims; and (d) placing unduly restrictive interpretations on the terms of their insurance policies for the purpose of denying coverage due.

127.    In committing its breaches, Defendants have acted with malice, shown a reckless and outrageous indifference to a highly unreasonable risk of harm, and acted with a conscious indifference to Plaintiff's and the Class members' rights and welfare.

128.    As a direct and proximate result of the above-referenced breach, Plaintiff has had to retain attorneys to enforce its rights, and those of the proposed Class, to the insurance coverage to which they are entitled and have thereby been injured and damaged.

129.    Plaintiff and the Class, therefore, are entitled to recover and seek in connection with this Cause of Action, for itself and the Class: (a) an award of general damages and other monetary damages, including all foreseeable consequential and incidental damages for diminution in value, loss of use, and other incidental damages and out-of-pocket expenses, plus interest, in an amount to be determined at trial; (b) costs of suit; and (c) reasonable attorney's fees in connection with this action.

**THIRD CAUSE OF ACTION**
**Unlawful Trade Under Rev. Code of Wash. § 19.86.010,** *et seq.*
**(On Behalf of Plaintiff and the Class)**

130.    Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in paragraphs 1–115 of this Complaint.

131.    Plaintiff brings this cause of action on behalf of itself and all Class members.

132.    The Washington Consumer Protection Act ("CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

133.    Plaintiff and Class members are persons within the meaning of the CPA.

134.    Defendants' conduct alleged herein was part of trade or commerce.

135.    This trade or commerce affected the people of the state of Washington.

136.    Defendants' conduct directly harmed the people of the state of Washington.

137.    Berkley North Pacific Group, LLC and other Defendants operate from a "home office" located in Bellevue, Washington.

138.    Upon information and belief, substantial conduct and decisions related to this action, including preparation, modification, and assessment of policy language, occurred in Bellevue, Washington.

139.    The state of Washington has an interest in regulating Defendants' conduct described herein which occurred in, caused harm in, or is connected to the State of Washington.

140.    Defendants' conduct alleged herein violates the "unfair" prongs of the  CPA, including but not limited to Defendants': (a) categorical and wrongful denial of Plaintiff's and the Class members' claims under the circumstances described in this complaint; (b) failure and refusal to perform a fair, objective, good-faith, and thorough investigation of the claims as required by Washington and other applicable law; (c) denial of Plaintiff's and the Class members' claims as part of a policy of categorically denying claims related to the Coronavirus; and (d) and failing to interpret their policies in an equitable manner and/or up to the standards

required by Washington law (including but not limited to RCW §§ 48.30.015, 48.01.030, *et seq.* and WAC §§ 284-30-330, 284-30-350, *et seq.*).

141.    Defendants' conduct alleged herein violates the "deceptive" prong of the CPA. Among other things, Defendants: (a) promised Plaintiff and the Class coverage that was not provided and that Defendants had no intention of providing; (b) promised to evaluate each claim individually, reasonably, and in good faith, which Defendants did not intend to do with respect to Plaintiff's and the Class members' claims; (c) falsely and misleadingly indicated to Plaintiff and the Class that they were investigating in good faith (and had investigated in good faith) their claims which Defendants did not do and knew that it did not do;  (d) collected Plaintiff's and the Class members' premiums in exchange for coverage that was not provided, inducing those premiums by promising to evaluate each claim individually, reasonably, and in good faith which Defendants did not do; and (e) denied Plaintiff's and the Class members' claim as part of a policy of categorically denying claims related to the Coronavirus as part of a strategy to reduce their total insurance payments related to the Coronavirus.

142.    Defendants' conduct alleged herein also violates Washington public policy, including as such policy is reflected in RCW §§ 48.30.015, 48.01.030, *et seq.*, WAC §§ 284-30-330, 284-30-350, *et seq.*, and elsewhere in Revised Code of Washington and Washington Administrative Codes.

143.    There is no provision of the Revised Code of Washington and Washington Administrative Codes which requires or expressly permits Defendants' conduct described herein.

144.    As Plaintiff and the Class' insurer, Defendants had an ongoing duty to Plaintiff and the Class to refrain from misrepresenting or omitting material information or engaging in other unfair or deceptive conduct.

145.    Defendants' unfair and deceptive conduct alleged herein was false, misleading, material had a tendency to deceive reasonable insureds, and did deceive Plaintiff and the Class.

Plaintiff and the Class members reasonably relied on Defendants' deceptions and omissions alleged herein, including but not limited to by paying premiums to Defendant.

146.    As a direct and proximate result of Defendants' unfair and deceptive conduct in violation of the CPA, Plaintiff and the Class members suffered and continue to suffer ascertainable losses and actual damages, including but not limited to premiums they have paid to Defendants and the non-receipt of insurance benefits that are owed to them by Defendants.

147.    Plaintiff and the Class are entitled to restitution from Defendants (with interest thereon), to disgorgement of all Defendants' profits arising out of their violations of the CPA (with interest thereon), and to be paid benefits due to Plaintiff and the Class members that Defendants has wrongfully retained by means of its violations of the CPA.

148.    Defendants' deceptive and unfair acts present a continuing risk to Plaintiff and Class, as well as to the people of Washington and the general public.

149.    Pursuant to RCW § 19.86.090, Plaintiff and the Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the CPA.

### FOURTH CAUSE OF ACTION
### Declaratory Relief
### (On Behalf of Plaintiff and the Class)

150.    Plaintiff re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–115 of this Complaint.

151.    Plaintiff brings this cause of action on behalf of itself and the proposed Class.

152.    The Court may declare rights, duties, statuses, and other legal relations, regardless of whether further relief is or could be claimed.

153.    An actual controversy has arisen between Plaintiff and the Class and Defendants as to their respective rights and duties under Plaintiff's and the Class members' insurance policies.

154.    Resolution of the parties' respective rights and duties under Plaintiff's and the Class members' insurance policies by declaration of the Court is necessary, as there exists no adequate remedy at law.

155.    Plaintiff alleges and contends, with respect to Plaintiff's and the Class members' Civil Authority coverage, that the above-described orders trigger that coverage because (a) they are orders of a civil authority, (b) the orders specifically prohibit access to the premises in question, including prohibiting potential on-premises dining customers and workers from accessing the premises in question, (c) such access prohibition has been continuous and ongoing since the orders were issued, such that the prohibited access has not subsequently been permitted, (d) the orders prohibit access as the direct result of direct physical loss of or damage to property, other than at the premises in question, caused by or resulting from a Covered Cause of Loss, (e) no coverage exclusions or limitations apply to exclude or limit coverage, (f) Plaintiff and the Class have suffered actual and covered loss of Business Income in an amount to be determined at trial, and (g) coverage should begin as of dates to be determined at trial.

156.    Plaintiff alleges and contends that Plaintiff's and the Class members' Lost Business Income Coverage is triggered because (a) Plaintiff and the Class members have sustained actual loss of Business Income due to the closure of their businesses, (b) said closure constitutes a necessary suspension of their operations under their insurance policies, (c) this suspension has been and is caused by direct physical loss of or physical damage to property at the premises in question, including personal property in the open (or in a vehicle) within 1,000 feet of the premises in question, due to the presence of Coronavirus, (d) the presence of Coronavirus is a Covered Cause of Loss, and (e) some or all of the periods of the Plaintiff's and Class members' closures are within the period of restoration under their insurance policies.

157.    Plaintiff alleges and contends that Defendants wrongly denied coverage with respect to all the foregoing provisions, as to Plaintiff and the Class.

158.    Upon information and belief, Plaintiff alleges that Defendants dispute and deny each of Plaintiff's contentions set forth in this Cause of Action.

159.    Plaintiff, therefore, seeks a declaratory judgment, on behalf of itself and the Class, regarding each of the contentions set forth in this Cause of Action.  A declaratory judgment determining that Plaintiff and the Class are due coverage under their insurance policies, as set forth above, will help to ensure the survival of these businesses during this prolonged closure made necessary by the orders and by the presence of Coronavirus around the businesses during this global pandemic.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, pray for judgment in their favor and against Defendants, as follows:

a.    For a declaration adopting each of Plaintiff's contentions set forth in the above Cause of Action for Declaratory Relief;

b.    For injunctive relief enjoining and restraining Defendants' unfair and/or deceptive conduct as alleged herein, including but not limited to their unfair and/or deceptive business practices and its wrongful denials of coverage under Plaintiff's and the Class' insurance policies;

c.    For specific performance of the insurance policies;

d.    For general and compensatory damages, restitution, and disgorgement, in an amount to be determined at trial;

e.    For  reasonable attorney's fees incurred in this action pursuant to RCW § 19.86.090 *et seq.*, other statutes, or as otherwise recoverable;

f.    For treble damages under RCW § 19.86.090 *et seq.* and any other just and proper relief under RCW § 19.86.090 *et seq.* and RCW § 19.86.020 *et seq.* or other applicable statutes;

g.    For  costs of suit;

h.      For pre judgment and post-judgment interest; and

i.      For such other relief as the Court may deem proper.

## VIII.  <u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury.


DATED this 13th day of May, 2020.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

*s/ Steven C. Berman*
Steven C. Berman, OSB No. 951769
sberman@stollberne.com
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:  503.227.1600
Facsimile:  503.227.6840

and

Robert J. Nelson (to be admitted *pro hac vice*)
Fabrice N. Vincent (to be admitted *pro hac vice*)
Jacob H. Polin (to be admitted *pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

and

Alexandra L. Foote (to be admitted *pro hac vice*)
LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  786.408.8083
Facsimile:  415.956.0561

*Attorneys for Plaintiff*